UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SALVATORE ALBANI,

                              Petitioner,

v.

ERIKA ALBANI,

                              Respondent.

Case No.:  15cv1980

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

The Court held a twelve day bench trial on Salvatore Albani's Verified Petition for the return of his child, I.A., to Singapore.[1] The Court's findings of fact and conclusions of law are set forth below.

**I.**

Petitioner Salvatore Albani ("Salvo") was born in Italy. He completed his medical school and residency in Italy and moved to the United States in 1989 as a postdoctoral researcher at the University of California, San Diego ("UCSD"), and the nearby Scripps Research Institute. Salvo specializes in translational immunology, and currently lives in Singapore where he teaches as a Professor at

---

[1] In cases involving minors, only initials are used. See Fed. R. Civ. P. 5.2(a)(3).

1

1   Duke-NUS and acts as Director of the SingHealth Translational Immunology and

2   Inflammation Centre ("STIIC"). In 1997, while teaching and practicing in San

3   Diego, Salvo purchased an ocean-front house in Encinitas, California ("Encinitas

4   house"), which he still owns today. Salvo also owns property in Italy, where he

5   still has family.

6          Erika Albani ("Erika") was born in Peru but moved to Venezuela when she

7   was eleven years old. She attended medical school in Venezuela and moved to

8   the United States in 2000 for her residency. She completed her residency in

9   Riverside, California, and began working at UCSD in 2001. Although her initial

10   position was unpaid, Erika soon obtained a postdoctoral fellowship. Erika's family

11   has since left Venezuela. Three of her sisters live near San Francisco, while her

12   father, mother, stepmother, and a fourth sister live in San Diego.

13          Salvo and Erika met in 2001 while both worked at UCSD. Prior to their

14   marriage, Erika moved into the Encinitas house with Salvo. The couple married

15   in San Diego on September 7, 2006. Shortly after the wedding, Salvo and Erika

16   moved from the Encinitas house to a house in the nearby neighborhood of

17   Olivenhain. The couple planned to tear down the Encinitas house and build a

18   larger house on the property. They obtained the necessary permits, hired an

19   architect, and gained the permission of the California Coastal Commission to

20   demolish their existing house and build their proposed house. Meanwhile, Salvo

2

continued his research and teaching position at UCSD while Erika worked as a family physician in Escondido, California.

## A.    The Move to Arizona

Salvo and Erika intended to move back to Encinitas as soon as they built their new house. However, in order to raise the money needed for the construction, Salvo began exploring other employment opportunities. Salvo's grant money had run out at UCSD and he was experiencing difficulties working with his previous wife, who was also a research scientist at UCSD. Moreover, the problems with Salvo's job and the pressure of trying to start a family had strained the couple's relationship.

In 2008, Salvo was offered a tenured faculty position at the University of Arizona in Tucson, Arizona. Erika agreed to move to Tucson because she believed it would help their marriage. Together, Salvo and Erika viewed Tucson as an opportunity to earn more money, advance Salvo's career, and rekindle their relationship. Salvo traveled to Tucson first, and Erika joined him sixth months later after she closed down her practice in San Diego. The couple kept the Encinitas home, but purchased a second home in Tucson. While in Arizona, they frequently traveled back to San Diego.

//

3

1   Their daughter I.A. was born on August 21, 2009—almost a year after the

2   move.

3

4   **B.    The Return to San Diego**

5   Following a change in leadership at the University, Salvo was no longer

6   receiving the money he was originally promised. Similar to the events that

7   transpired leading up to the move to Tucson, Salvo was soon dissatisfied with his

8   job and his relationship with Erika again suffered. In February 2010, the family

9   elected to move back to San Diego. At the time of the move, I.A. was

10  approximately six months old. The family turned their Tucson house into a rental

11  and moved back into the Encinitas house.

12  Salvo began working at the Sanford Burnham Institute, but was unable to

13  obtain further funding outside the grants he brought with him. Although Salvo

14  was making close to $200,000 per year, the position did not offer tenure. Erika

15  initially stayed at home to take care of I.A. following the move, but soon began

16  working at UCSD as a family practitioner.

17  I.A. spent the next two-and-a-half years in the Encinitas house. I.A. was

18  enrolled in pre-school in San Diego, and took classes in gymnastics, swimming,

19  and Capoeira (a Brazilian martial art). Because Erika's parents and her sister's

20  family live in San Diego, I.A. also spent time with her cousins and grandparents.

4

## C.     Singapore Negotiations

Salvo and Erika's relationship continued to deteriorate following the move back to San Diego. Salvo was stressed financially and was unhappy with his position at Sanford Burnham. In response, he began exploring opportunities in Singapore with Singapore Health Services ("SingHealth") and Duke-NUS, a graduate medical school located in Singapore but affiliated with Duke University in the United States.[2] Following a visit in November 2011, Salvo was impressed with the academic environment in Singapore. He viewed Singapore as a viable career option given his perception of the Singapore government's commitment to advancing medical research.

In February 2012 Salvo forwarded Erika an email from a SingHealth representative that detailed travel arrangements, information regarding finding a house, meetings for Erika, and visits to childcare centers—all related to an upcoming family visit to Singapore. The family traveled together to Singapore sometime in 2012. In April 2012 Salvo sent SingHealth an Executive Summary detailing his plans for a Translational Immunology and Inflammation Program to be instituted in Singapore with help from both SingHealth and Duke-NUS.

//

---

[2] SingHealth and Duke-NUS partner to combine their clinical and research facilities. SingHealth also coordinates with KK Women's and Children's Hospital, discussed below.

15cv1980

On August 9, 2012, Salvo sent Erika an email with an attachment containing his detailed negotiation points. The attachment outlined the family's expenses, Salvo's current employment proposal from SingHealth, and his potential counter-offer. The attachment explored scenarios where Erika did not have to work and where the couple retained their Encinitas house and rented it out as an additional source of income. Also in the attachment, Salvo explained his request for a long-term commitment from SingHealth rather than a short-term consulting position, and included in his potential counter-offer a request for a tenured position at Duke-NUS.

**D.    Offers of Employment**

Salvo received the following offer letters from SingHealth and their affiliates: an offer in December 2012 from KK Women's and Children's Hospital as a Senior Clinician Scientist; an offer in April 2013 from SingHealth as a Principal Research Scientist; an offer in November 2013 from Duke-NUS as a tenured Professor; and an offer in November 2013 from SingHealth as a tenured Senior Clinical Scientist. The first two offers are discussed in this section, while the last two offers are discussed infra, section G.

//

//

6

15cv1980

1

### 1.    _December 2012 Offer_

2    Salvo received a written offer from KK Women's and Children's Hospital on

3 December 13, 2012. The offer included a five year renewable contract subject to

4 the agreement of the parties with a starting salary of S$25,000 per month.[3] Also

5 mentioned in the offer letter was an academic appointment with tenure at Duke-

6 NUS, to be issued at a later time by the medical school. In total, Salvo would be

7 appointed as a Senior Clinician Scientist at KK Women's and Children's Hospital,

8 a Senior Consultant with the Department of Pediatric Subspecialties, and the

9 Director of STIIC, operated jointly by SingHealth and Duke-NUS. Although the

10 offer letter is signed by Salvo, the record is unclear as to whether or not it was

11 accepted.

12    Following this initial offer letter, Salvo received an email from Dr. Soo Khee

13 Chee discussing potential offers of tenureship and a potential position for Erika in

14 family medicine at KK Hospital and Duke-NUS. Salvo forwarded this email to

15 Erika.

16    On March 9, 2013, Erika sent an email to Claudine Toh, a Singapore

17 realtor, asking about housing options in Singapore. Erika mentioned in the email

18

19 ───────────────

20
[3] The Singapore dollar is distinguished by an "S" before the "$" sign. On November 10, 2015, one Singapore dollar was equal to $0.70 U.S. dollars. See XE Currency Converter (available at www.xe.com).

7

1  that the move to Singapore was official and scheduled for the end of June. Erika

2  forwarded this email to Salvo.

3       2.   *April 2013 Offer*

4       Salvo's second offer letter came from SingHealth on April 11, 2013. In this

5  letter, Salvo was offered a position as a Principal Research Scientist with a

6  monthly salary of S$25,000, a clinical allowance of S$6,000, a housing allowance

7  of S$7,000 per month, an education subsidy for I.A. capped at S$25,000 per

8  year, and a S$15,000 travel allowance for his family. The contract specified an

9  initial term of five years with an option to renew, subject to the agreement of both

10 parties. Salvo signed this offer on April 14, 2013, and wrote June 1, 2013, as his

11 start date in Singapore.

12

13 **E.   Conditions Surrounding the Move**

14      At trial, the court heard testimony in addition to that of Salvo[4] regarding the

15 potential length, circumstances, and reasons for the move to Singapore.

16      1.   *Dr. Kee Chong Ng's Testimony*

17      Dr. Kee Chong Ng represented SingHealth in negotiations with Salvo

18 leading up to the Singapore move, and testified on Salvo's behalf at trial. Dr. Ng

19 _____

20      [4] The Court finds Salvo's testimony credible. Salvo's statements at trial were consistent with the record as a whole and testimony from other credible witnesses.

15cv1980

1   stated that tenureship was always a part of his discussions with Salvo; he viewed

2   Salvo's position as a long-term agreement, given that SingHealth invested over

3   S$8 million to create a lab suitable for Salvo's translation immunology research.

4   According to Dr. Ng, Salvo agreed to close his practice at Sanford Burnham and

5   relocate to Singapore long-term. When the family visited Singapore, and again

6   when Dr. Ng visited the family in San Diego, Dr. Ng communicated his intentions

7   in hiring Salvo with Erika.

8       With regard to the five-year term in the April 2013 offer, Dr. Ng stated that

9   such a provision was necessary should the parties wish to reevaluate Salvo's

10   research after the first five years. Regardless of the five-year provision, Dr. Ng

11   expected Salvo to be with SingHealth for at least fifteen to twenty years.

12       Dr. Ng also clarified the meaning of tenure within Salvo's position: the

13   tenured position at Duke-NUS was initially contingent on Salvo's employment

14   with SingHealth. In other words, so long as Salvo held a position at SingHealth,

15   he would also be a tenured professor at Duke-NUS. However, Salvo would not

16   be receiving separate compensation for his professorship.

17       _2._   _Dr. Gene Kallenberg's Testimony_

18       Dr. Gene Kallenberg is the Chief of Family Medicine at UCSD and testified

19   on Erika's behalf. Erika worked for Dr. Kallenberg immediately before she moved

20   to Singapore with her family.

9

15cv1980

1   According to Dr. Kallenberg, Erika said she was moving to Singapore, but

2   that she expected to return within three to five years. Dr. Kallenberg testified that

3   he did his best to keep a position open for Erika upon her expected return

4   because he valued her both as a doctor and a colleague.

5   *3.*   *Dr. Martin Lotz's Testimony*

6   Dr. Martin Lotz and Salvo worked together at UCSD prior to the Albanis'

7   move to Singapore. Salvo and Dr. Lotz maintain both a professional and a

8   personal relationship. Dr. Lotz testified on behalf of Salvo at trial.

9   Prior to the Singapore move, Dr. Lotz discussed Salvo's opportunity with

10   both Erika and Salvo. Dr. Lotz stated that Singapore presented an unusual

11   opportunity because of the funding and support Salvo would receive from the

12   Singapore Government. From Dr. Lotz's experience as a research scientist, he

13   viewed this type of situation as unique from the United States, given that in the

14   United States, research grants control the distribution of funds. Dr. Lotz noted

15   that Salvo viewed the move to Singapore as the last move of his career.

16   Dr. Lotz also testified about his discussions with Erika leading up to the

17   move. Erika was struggling with her position at UCSD given the long hours and

18   administrative responsibilities. She viewed Singapore as an opportunity for a

19   break and looked forward to raising I.A. in a new environment.

20   //

In the weeks before the move, Dr. Lotz attended a good-bye party at the Encinitas house. At the party, Dr. Lotz recalled talking with Erika and Salvo while they tried to light a Chinese lantern from the balcony. Salvo expressed his concerns about the move, but remained hopeful that it would be the final move of his career. Likewise, Erika seemed excited about the move.

### 4.    *Erika's Testimony*[5]

Leading up to the Singapore move, Salvo and Erika experienced difficulties in their marriage, which Erika attributes to financial stress. Salvo seemed concerned that he was not making enough money to support the family's lifestyle. Erika agreed to move to Singapore because she thought it would help her relationship with Salvo; the significant increase in salary would relieve Salvo's financial stress and help mend their relationship.

Moreover, the move would give Erika time to rest following the death of her brother, and she would have time to regroup following the stressful nature of her previous job. Salvo's reduced stress from the extra income and research opportunities would also help life at home. Finally, I.A. would get to experience a

---

[5] The Court does not find much of Erika's testimony credible. Many of the statements made during her testimony at trial were inconsistent with sworn affidavits made in the Singapore proceedings discussed below, as well as inconsistent with WhatsApp conversations with her husband. Moreover, her demeanor on the stand was self-serving. The following testimony is viewed by the Court as credible.

11

1   new culture where she would make new friends, learn new languages, and enroll

2   in excellent schools.

3

4   **F.     The Move to Singapore**

5          Salvo, Erika, and I.A. moved to Singapore in the end of June 2013—two

6   months before I.A.'s fourth birthday. Prior to the move, Salvo refinanced the

7   Encinitas house, putting Erika's name on the title in the process in order to

8   include her income in any loan applications. Salvo signed a vacation rental

9   agreement in March 2013 with North Coast Vacation Properties, LLC, in order to

10  rent the Encinitas house as a vacation rental. The family renovated the Encinitas

11  house for this purpose, and purchased new furniture and house accessories.

12  Salvo borrowed $100,000 from a friend to help pay for moving expenses, and the

13  family shipped an expensive couch and dining table, Salvo's rowing shell,

14  silverware, jewelry, and some personal items.

15         The family sold Salvo's motorcycle and two cars, but Salvo kept his

16  Maserati in the garage at the Encinitas house and made arrangements with

17  Erika's father, Carlos Cox, to act as the car's caretaker. Those items not moved

18  to Singapore were boxed up and left in the garage. In addition to the services

19  provided by the rental agency, Erika's mother moved into the casita next to the

20  //

1   garage and arranged with Salvo to collect the mail and make sure the house was

2   maintained.

3         Erika notified Dr. Kallenberg and her colleagues at UCSD about the move.

4   Erika expressed her desire to rejoin the practice group when they returned to

5   San Diego, and told Dr. Kallenberg they would likely be back in three to five

6   years. Salvo closed his lab at Sanford Burnham and made arrangements for two

7   of his postdoctoral researchers to join him in Singapore.

8         At the time of this trial, Salvo's Maserati was insured by Geico in the United

9   States, and Salvo and Erika were registered to vote in California. Salvo and Erika

10  both maintain California driver's licenses, and their medical licenses are active

11  and up-to-date in California. Moreover, Salvo continues to receive mail at the

12  Encinitas house. At trial, the parties spent considerable time scrutinizing the

13  contents of Salvo's mail. Salvo and Erika receive, inter alia, bank statements,

14  mortgage statements, magazine subscriptions, junk mail, information regarding

15  their medical licenses and Salvo's car insurance, and correspondence relating to

16  their Tucson property. Finally, Salvo and Erika paid taxes in the United States as

17  citizens living abroad during their time together in Singapore.

18        In Singapore, the family signed a two year lease on a four-story, roughly

19  4,000 square foot apartment. They purchased other items to furnish their home,

20  as well as a car and a new motorcycle. They also hired a live-in maid to clean the

13

1   house and help take care of I.A. Salvo began his new job on July 1, 2013. I.A.

2   attended preschool shortly after the move, and was accepted the following month

3   to United World College in Singapore ("UWC")—a well-regarded school for

4   children ages 4-19. The UWC boasts an international baccalaureate program

5   that the family felt would help I.A. eventually transition to schools back in the

6   United States.

7        Salvo understood the move to Singapore as a long-term professional

8   commitment. Although he did not have an official tenureship offer from either

9   SingHealth or Duke-NUS at the time of the move, he was in discussions with the

10  University and hospital system prior to relocating, and expected to be offered

11  tenure shortly after arriving in Singapore. In fact, tenureship was specifically

12  alluded to in his previous offers. He discussed his offers of employment with

13  Erika.

14       Erika understood that the move would be long-term. She planned on taking

15  some time off before working as a family physician in Singapore. She told her

16  former employer, Dr. Kallenberg, that the move was for a limited time realizing

17  that in the event Salvo grew unhappy with Singapore—like he did in Tucson—he

18  would look for other options. Because of the family's ties to San Diego, this

19  meant possibly returning to the Encinitas house. However, she also believed the

20  move to Singapore would be long-term, and looked forward to starting a new

career, mending her relationship with Salvo, and raising I.A. in Singapore. When she told Dr. Kallenberg that she would return in three to five years she was merely keeping an option open should Salvo grow frustrated with his position in Singapore.

## G.    Life in Singapore

Immediately following the move to Singapore, the family thrived. Erika enjoyed her time off from work and Salvo excelled at SingHealth as the director of STIIC. I.A. began her education at the UWC, made new friends, and participated in gymnastics, swimming, and capoeira. WhatsApp messages between the couple display their happiness: on a trip back to San Diego in October 2013, Erika mentioned to Salvo after a run on the beach that she was much happier in Singapore than she had previously been in San Diego. Salvo was making more than twice what he made at Sanford Burnham, and the family enjoyed traveling around Singapore as well as taking trips back to the United States.

On October 18, 2013, Salvo received the Singapore Translational Research Investigator Award ("STaR award"). The STaR award is granted by the Singapore Ministry of Health, and offers a five-year research grant worth up to S$5 million, salary support up to S$600,000, and additional start-up costs.

15cv1980

1     *1.     November Offers of Tenure*

2          On November 4, 2013—four months after arriving in Singapore—Salvo

3     accepted an offer from Duke-NUS as a Professor on a tenure contract. The offer

4     letter noted that Salvo's position at Duke-NUS ran in tandem with his position at

5     SingHealth, and that his salary at SingHealth was inclusive of his academic

6     appointment at Duke-NUS. In other words, should Salvo lose his position at

7     SingHealth, his position at Duke-NUS would terminate. Therefore, as of

8     November 4, 2013, Salvo had an employment contract as a tenured professor,

9     contingent on his position at SingHealth.

10          On November 13, 2013, Salvo received a tenureship offer from SingHealth.

11     The SingHealth November offer superseded the April offer mentioned supra,

12     section D. Moreover, the November offer did not contain a five-year escape

13     clause; rather, it was a complete offer of tenureship appointing Salvo as a Senior

14     Clinical Scientist at SingHealth. The contract also contained a five year budget

15     for STIIC, referencing Salvo's STaR award as a means to offset some of the

16     costs for the term of the award.

17          On November 7, prior to the November 13 offer, Salvo told Erika through

18     WhatsApp that he received tenure. In the message, Salvo expressed his disbelief

19     that he would be making S$600,000 per year until the age of sixty-five. Thus, as

20     of November 13, 2013, Salvo had tenure not only as a professor at Duke-NUS,

16

1   but also as a Senior Clinical Scientist at SingHealth. Erika knew of Salvo's

2   tenureship discussions prior to moving to Singapore, and knew that Salvo

3   received tenure in November 2013.

4        2.    *Erika's Employment in Singapore*

5        Erika initially took time off from work following the move to Singapore. She

6   experienced the tragic death of a family member, and used the months

7   immediately following the move as a time to regroup and recover.

8        As part of Salvo's negotiations with SingHealth, Erika was promised a

9   position at KK Women's and Children's Hospital as a practicing physician. On

10  July 29, 2014, Erika received an offer letter for a part-time, three-year position as

11  a Senior Resident Physician. Because English is not her first language, Erika

12  was required to take the Test of English as a Foreign Language ("TOEFL") exam

13  before she received her license to practice medicine in Singapore. She

14  previously passed the exam in 2001 in order to practice in the United States, but

15  failed to pass the exam in Singapore. Thus, Erika was unable to practice as a

16  physician in Singapore.

17       Discussed in more detail below, Erika eventually obtained a position as a

18  part-time project manager at KK Hospital in October 2014. The position paid

19  S$5,000 a month for twenty-two hours of work a week.

20  //

17

1       *3.*    *Permanent Residency Status*

2       The family first started the application process for permanent residency in

3  Singapore in November 2013. Prior to obtaining permanent residency status,

4  Salvo was legally present in Singapore on a long-term residence pass. Erika and

5  I.A. possessed dependency passes that were tied to Salvo's residence pass.

6  Permanent residency is a prerequisite to citizenship and provides benefits

7  including tax incentives, improved access to healthcare, easier transportation at

8  the borders, and priority entrance to the Singapore public schools.

9       The family scheduled to meet with an official regarding their permanent

10  residency application in September 2014. However, following her separation from

11  Salvo, discussed below, Erika withdrew her permanent residency application.

12  Salvo's application for permanent residency has since been approved.

13       *4.*    *I.A.'s Activities in Singapore*

14       I.A. was enrolled at the UWC for the two years prior to these proceedings,

15  and attended a different preschool for the month prior to her acceptance at UWC.

16  Her extracurricular activities while in Singapore included gymnastics, swimming,

17  and capoeira. She participated in school trips and attended summer camps. She

18  traveled with her parents—either separately or as a family—to multiple

19  destinations around Singapore and around the globe, including Italy, San Diego,

20  Thailand, Indonesia, and Disneyland in Hong Kong.

18

1   She also had many friends both in school and in her neighborhood. While

2   many of her friends at UWC also came from ex-patriot families, she had friends

3   native to Singapore as well. Erika and Salvo made a point of exploring Singapore

4   with I.A., traveling to the ethnic neighborhoods, visiting the zoo and museums,

5   and playing at the local parks. Finally, I.A. was a patient of a dentist and a

6   pediatrician while in Singapore.

7

8   **H.    Erika and Salvo's Separation**

9   Erika and Salvo viewed the move to Singapore partly as a means to mend

10   their relationship. However, the couple's relationship only briefly improved

11   following the move. WhatsApp messages show the growing tension between the

12   couple, which Erika attributes to Salvo's work and persistent travel. Although

13   Salvo excelled professionally, Erika failed to pass her TOEFL exam, prohibiting

14   her from practicing as a licensed physician in Singapore. Erika was unhappy with

15   having to resort to a project manager position; as a trained physician, she wanted

16   to practice medicine.

17   The couple eventually chose to separate. Divorce in Singapore was

18   unavailable because Singapore law requires a residency period which the couple

19   could not meet. Instead, the couple signed a Deed of Separation ("DOS"), which

20   outlined, among other things, their agreements for shared custody, spousal

19

1    support, and the distribution of assets. The parties agreed upon a Singapore-

2    based law firm to help facilitate the DOS, and Erika and Salvo signed the

3    document on November 14, 2014.

4         The circumstances surrounding the DOS were hotly disputed at trial. Erika

5    testified that she felt threatened to sign the DOS because she was out of options

6    and had no other alternative. Furthermore, she stated that Salvo was emotionally

7    and financially abusive in controlling her expenses, and that he verbally

8    threatened her to force her signature. The Court does not find this testimony

9    credible. The record clearly indicates that during the negotiations relating to the

10   DOS, Erika participated voluntarily and expressed to others her belief that Salvo

11   was a caring man and a good father. Specifically, WhatsApp messages with

12   Salvo and a letter to Dr. Lotz contradict her claim.

13        According to the terms of the DOS, Erika and Salvo shared care and

14   custody of I.A. on an alternating weekly schedule; I.A. would spend one week

15   with Salvo and the next week with Erika. Soon after the parties signed the DOS,

16   Erika moved out of the shared family apartment and into an apartment of her

17   own. The parties also signed an international travel agreement, requiring the

18   accompanying-parent to furnish all travel plans to the other parent for approval.

19        The DOS also contained provisions relating to the couple's finances: Salvo

20   agreed to pay Erika S$4,000 a month in support; the couple continued to share

his travel stipend from his job at SingHealth; and Salvo paid for I.A.'s education

expenses. Erika signed two quitclaim deeds transferring her interests in the

Tucson and Encinitas properties to Salvo, and Salvo agreed to service the

remaining debts on the mortgages.

Following the separation, the couple worked hard to make I.A.'s transition

as smooth as possible. Salvo adjusted his work schedule so that he could pick

I.A. up after school and stay with her overnight. Each parent continued to take

I.A. on trips outside of Singapore, always receiving the consent of the other

parent. They made parenting decisions together, and were flexible in the event

one parent needed to adjust their time with I.A. to accommodate other

commitments.

Beginning in October 2014, Erika worked as a project manager at KK

Hospital. In April 2015 Erika notified Jennifer Woon at Duke-NUS via email that

major changes in her personal life might have altered her intention of obtaining a

faculty position. Ms. Woon responded that the University was finalizing her

appointment and title. Erika requested a leave of absence from her project

manager position later that month.

Dissatisfied with her job, and following a series of medical issues, Erika

approached Salvo with the proposition that she return to San Diego. She

suggested a few possible scenarios were the parties would continue to share

15cv1980

1   custody and care of I.A., including one involving I.A. spending the summers with

2   Erika in San Diego and the school year with Salvo in Singapore. Salvo was

3   unwilling to consider sending I.A. to San Diego.

4

5   **I.    Legal Proceedings**

6          On April 23, 2015, Erika filed an application in Singapore family court for

7   joint custody and leave to relocate permanently with I.A. to San Diego. Erika

8   chose to file in the court in Singapore because she was advised by attorneys in

9   Singapore that the San Diego courts did not have jurisdiction to hear her request.

10  At the time of the alleged wrongful removal, no decision was made on the merits.

11  The Singapore court deemed the case on Erika's application withdrawn as of

12  August 13, 2015. At Salvo's request, the Singapore court set a hearing on the

13  merits in an order dated September 28, 2015.

14         As part of a planned trip approved by Salvo, Erika and I.A. traveled to San

15  Diego on July 3, 2015, with a return ticket to Singapore booked for July 21, 2015.

16  Salvo had plans to take I.A. to Italy for a vacation, and then the family as a whole

17  planned on celebrating I.A.'s sixth birthday in Singapore with a party.

18         While in San Diego, and at the advice of her sister, Erika visited an attorney

19  to discuss her situation in Singapore. At this visit, Erika was advised that San

20  Diego, not Singapore, had jurisdiction to hear her divorce case. Thus, on July 13,

2015, and while still in San Diego, Erika filed for dissolution of marriage in San Diego Superior Court. Her initial petition states that Erika and Salvo had been residents of California for sixth months prior to the date her petition was filed.

Erika also filed a declaration under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") on July 13, 2015, that listed Singapore as her place of residence from June 2013 to July 2015. In her amended UCCJEA application, filed on August 17, 2015, Erika only listed San Diego as her place of residence following her return from Tucson in 2010.

Erika did not return to Singapore, and she currently resides with I.A. in the Encinitas house. On September 4, 2015, Salvo filed a verified petition in this Court seeking the return of I.A. to Singapore pursuant to the Hague Convention. (ECF No. 1.)

## II.

The Hague Convention on the Civil Aspects of International Child Abduction ("Convention" or "Hague Convention") was adopted in 1980 by the Hague Conference on Private International Law. See Hague Convention, Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11 ("Treaty Doc."). The Convention addresses the use of international borders to obtain custody during domestic disputes, and seeks to "secure the prompt return of children wrongfully

23

1  removed to or retained in any Contracting States." Treaty Doc., art. 1, § a.[6]

2  Specifically, the Convention focuses on cases where a child is removed from a

3  parent that is lawfully exercising custody rights in the child's State of habitual

4  residence. 1980 Conference de La Haye de droit international price, Enlevement

5  d'enfants, E. Perez-Vera, ¶ 12 ("Perez-Vera Report"), in 3 Actes et Documents

6  de la Quatorizieme Session, pp. 425-473 (1982).[7]

7       Congress instructed courts to decide cases in accordance with the

8  Convention, implementing the Convention through the International Child

9  Abduction Remedies Act ("ICARA"). See 22 U.S.C. § 9003(d); Abbott v. Abbott,

10  560 U.S. 1, 9 (2010). As reiterated in ICARA, the purpose of the Convention is

11  "to determine only rights under the Convention and not the merits of any

12  underlying child custody claim." 22 U.S.C. § 9001(b)(4); see also Holder v.

13  Holder, 392 F.3d 1009, 1013 (9th Cir. 2004) ("The Convention's focus is [ ]

14  *whether* a child should be returned to a country for custody proceedings and not

15  *what* the outcome of those proceedings should be.").

16

17  _____

18      [6] The United States and Singapore are contracting States to the Convention. See Status Table, Hague Conference (available at http://www.hcch.net/index_en.php?act=

19  conventionsstatus&cid=24).
     [7] The Perez-Vera Report is cited extensively in circuit and district court opinions. The

20  Supreme Court cited to the Perez-Vera Report in Abbott v. Abbott, 560 U.S. 1 (2010), but declined to comment on its persuasiveness. Regardless, the Supreme Court viewed the Perez-Vera Report as equivalent to a scholarly article. Id. at 19.

24

15cv1980

1    The Convention requires the prompt return of a child wrongfully removed

2  from the State of the child's habitual residence. Treaty Doc., art. 3, § a. Removal

3  is wrongful if it is "in breach of custody attributed to a person . . . under the law of

4  the State in which the child was habitually resident immediately before the

5  removal or retention." Treaty Doc., art. 3, § a. The petitioner must establish by a

6  preponderance of the evidence that removal was wrongful. 22 U.S.C. §

7  9003(e)(1)(A).

8    I.A.'s removal can only be deemed wrongful if Singapore was her place of

9  habitual residence. Thus, the first inquiry is whether Singapore was I.A.'s place of

10  habitual residence at the time Erika removed I.A. to San Diego.

11

12  **A.    Habitual Residence**

13    Habitual residence is a mixed question of law and fact, and courts are

14  instructed to "consider the unique circumstances of each case when inquiring

15  into a child's habitual residence." Holder, 392 F.3d at 1016. Although the term

16  "habitual residence" was intentionally left undefined in the Convention to avoid

17  formalistic determinations, this ambiguity caused confusion as to how the courts

18  should interpret a child's residence. See id. at 1015.

19    In Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001), the Ninth Circuit laid out

20  the analytical framework for determining habitual residence. In order to acquire a

25

1    new habitual residence, there must be a settled intention to abandon the one left

2    behind, an actual change in geography, and a passage of an appreciable period

3    of time. Holder, 392 F.3d at 1015 (citing Mozes, 239 F.3d at 1071-73).

4        *1.    Settled Intent*

5        To acquire a new habitual residence, there must be a "settled intention to

6    abandon the one left behind." Mozes, 239 F.3d at 1075. "The intention or

7    purpose which has to be taken into account is that of the person or persons

8    entitled to fix the place of the child's residence." Id. at 1076. When the child at

9    issue has "not yet reached a stage in their development where they are deemed

10   capable of autonomous decisions as to their residence," as is the case here, the

11   appropriate inquiry is the subjective intent of the parents. Holder, 392 F.3d at

12   1016-17. At issue in this case is whether Erika and Salvo shared a settled intent

13   to abandon San Diego and adopt Singapore as their place of habitual residence.

14       When the parties no longer agree on their intentions, "the representations

15   of the parties cannot be accepted at face value, and courts must determine from

16   all available evidence whether the parent petitioning for return of a child has

17   already agreed to the child's taking up habitual residence where it is." Mozes,

18   239 F.3d at 1076. Here, Erika contends that the family never intended to make a

19   long-term move to Singapore; she insists that the Albanis meant to return to the

20

26

1  Encinitas house after five years in Singapore. Salvo argues that the move to

2  Singapore was a final career move meant to last indefinitely.

3    The <u>Mozes</u> court recognized three broad categories common to Hague

4  Convention cases when the parties no longer agree on their intentions. On one

5  end of the spectrum are cases where courts typically find an intent to abandon:

6  when the "family unit has manifested a settled purpose to change habitual

7  residence, despite the fact that one parent may have had qualms about the

8  move." <u>Id.</u> at 1076. This happens when "both parents and the child translocate

9  together under circumstances suggesting that they intend to make their home in

10  the new country. <u>Id.</u> at 1076-77.

11    On the other end of the spectrum are cases where the child's initial

12  translocation from an established habitual residence was clearly intended to be

13  of a specific, delimited period," and the habitual residence remained unchanged.

14  <u>Id.</u> at 1077. In between are cases where a parent earlier consented to a stay

15  abroad, but disputes the actual time frame of the stay once the alleged abduction

16  occurs. <u>Id.</u>

17    This case falls in line with the first category described above—that despite

18  the qualms of one parent, the parties shared an intent to abandon a prior habitual

19  residence and establish a new one. The Court finds as a fact that Salvo and

20

27

1   Erika shared the intent to change their habitual residence from San Diego to

2   Singapore, even though Erika had qualms about the move.

3         Reservations about a move are insufficient to defeat a settled intention to

4   abandon a previous habitual residence and establish a new one. Mozes, 239

5   F.3d at 1077. In Mozes, the Ninth Circuit noted that, "when courts find that a

6   family has jointly taken all the steps associated with abandoning habitual

7   residence . . . they are generally unwilling to let one parent's alleged reservations

8   about the move stand in the way of finding shared and settled purpose." Id.; see

9   also Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995) (noting that a shared

10  intent to establish a new habitual resident existed even if the respondent believed

11  she would leave if her marriage did not improve).

12        The Albanis took all the steps associated with abandoning San Diego as

13  their habitual residence. They moved furniture, personal items, and a rowing

14  shell, turned their house into a vacation rental, and held a good-bye party. Salvo

15  resigned from his position at Sanford Burnham, and Erika gave her employer

16  notice. In Singapore, they rented a four-story apartment, opened bank accounts,

17  enrolled I.A. in preschool, and purchased more furniture to complete their home.

18  When the marriage fell apart, Erika and Salvo sought the assistance of a

19  Singapore law firm to facilitate their separation. When Erika wanted to relocate to

20  San Diego, she filed her petition first with the Singapore family court. Although

28

they each had significant ties to the United States, they intended that San Diego would be their vacation destination, not that the city would remain their habitual residence. In short, their actions demonstrate an intent to leave San Diego behind.

Moreover, the move to Singapore was not simply a sabbatical or conditional stay. See Holder, 392 F.3d at 1018 (noting that sabbaticals and other conditional stays are not sufficient to abandon a prior habitual residence). The family in Holder moved to Germany for a four-year military tour. Id. The court recognized decision of other circuit courts that placed emphasis on the shipment of possessions and the failure to maintain a residence in the former location as evidence of an intent to abandon. Id. However, the court found that the family's move was conditional given the unique circumstances of a relocation on military assignment—even though they moved possessions and sold their previous house. Id. ("We do not view [moving possessions] as dispositive [to abandoning a habitual residence] . . . considering that, as is customary, the military transported their belongings, thereby providing an incentive to move all possessions.")

The Ninth Circuit's holding in Holder is indicative of the fact-specific inquiry necessary in Hague proceedings. See id. at 1016 ("We emphasize that courts must consider the unique circumstances of each case when inquiring into a

29

1   child's habitual residence."). Even though the Holders sold their house in the

2   United States and moved all of their possessions, their move was based on

3   military duty. The court recognized that the Holders did not abandon the United

4   States as their place of habitual residence. In this case, the opposite is true.

5   Although the Albanis kept possessions and property in the United States, the fact

6   that Salvo pursued a long-term tenured research and faculty position in

7   Singapore illustrates the indefiniteness of their move. Unlike the father in Holder

8   that was being sent for a four-year tour of duty, Salvo's position did not have an

9   end date.

10          Indeed, the shared intent was that if Salvo was successful, this would be

11   his last professional move and he would retire from the Singapore position. The

12   fact that Erika thought that, given Salvo's past dissatisfaction with his position,

13   they may very well leave in three to five years does not change what they both

14   intended.

15          Singapore does not necessarily need to be the country where the Albanis

16   intended to "leave [their] bones." Mozes, 239 F.3d at 1074. It is clear that both

17   Erika and Salvo remain attached to San Diego. A large part of Erika's family is in

18   San Diego, and Salvo has many friends in San Diego and owns a house in

19   Encinitas. There is a likelihood that, regardless of the result in this case, the

20   parties will end up in San Diego at a later time. However, the parties intended to

30

15cv1980

1   abandon San Diego for Salvo's tenured position in Singapore, they intended to

2   raise I.A. in Singapore, and they intended to live in Singapore for an indefinite

3   period of time and clearly for the foreseeable future.[8]

4        Erika asks the Court to rely on the First Circuit's decision in Neergaard-

5   Colon v. Neergaard, 752 F.3d 526 (1st Cir. 2014), as a basis for the conclusion

6   that San Diego is I.A.'s place of habitual residence. The family in Neergaard

7   moved to Singapore when the petitioner's employer moved him for a three year

8   period. Id. The petitioner obtained an employment pass, and the respondent and

9   their two children each received a dependent's pass. Id. at 529. Moreover, the

10  parties obtained health insurance in Singapore, opened bank accounts, enrolled

11  in classes, looked at preschools, and found pediatricians while at the same time

12  keeping bank accounts, retirement accounts, and property back in the United

13  States. Id.

14       Erika is correct: the facts between Neergaard and this case are very

15  similar. However, the two cases are easily distinguishable by the circumstances

16  surrounding the initial move. In Neergaard, the father was relocated to Singapore

17

18  _____

19       [8] The Court is convinced that, even after her separation from Salvo, Erika was content
    on practicing medicine and raising I.A. in Singapore. Her intent changed after she failed the
20  TOEFL exam, which left Erika stuck in Singapore without the ability to practice medicine. It is
    unlikely that she would have moved to San Diego had she passed the exam and could practice
    medicine in Singapore.

by his employer for three years. In this case, Salvo accepted an entirely new position in Singapore, quitting his job in San Diego in the process. While Erika and Salvo did keep property, bank accounts, retirement accounts, and credit cards in the United States, they intended to move to Singapore to start a new life and career. Unlike the petitioner in <u>Neergaard</u> that was merely relocated overseas for a finite period, Salvo moved his entire career to Singapore. Any ties remaining in San Diego are insufficient to support the conclusion that the move was merely a temporary assignment. The fact is that Erika and Salvo abandoned San Diego and adopted Singapore as their new habitual residence.

### 2.   *Acclimatization*

Although there was a shared settled intent to abandon the United States for Singapore, I.A.'s return to Singapore is also proper because she has acclimatized to life in Singapore. As the <u>Mozes</u> court noted, altering a child's habitual residence doesn't necessary rely on the intent of the parents; it requires an actual change in geography and the passage of an appreciable period of time sufficient for acclimatization. <u>Mozes</u>, 239 F.3d at 1078. The inquiry is not whether the child is happy where she currently resides, but rather if "one parent is seeking unilaterally to alter the status quo with regard to the primary locus of the child's life." <u>Id.</u> at 1079.

32

1      As the Ninth Circuit cautioned in <u>Holder</u>, acclimatization should not be

2  confused with acculturization. <u>Holder</u>, 392 F.3d at 1019. Rather, the inquiry must

3  focus on whether the child's life has become "firmly rooted in [her] new

4  surroundings" such that returning the child to Singapore would be tantamount to

5  sending her home. <u>Id.</u>  This coincides with the spirit of the Convention, which

6  "aims to secure the immediate reintegration of the child into its habitual

7  environment." <u>Id.</u> at 1021 (citing Perez-Vera Report ¶ 25).

8      In <u>Holder</u>, the Ninth Circuit discussed the role of acclimatization in the

9  absence of a shared settled intent to abandon a previous habitual residence. The

10  court noted that, "in the absence of settled parental intent, courts should be slow

11  to infer from such contacts that an earlier habitual residence has been

12  abandoned." <u>Holder</u>, 392 F.3d at 1019 (citing <u>Mozes</u>, 239 F.3d at 1079).

13  Likewise, in <u>Mozes</u>, the Ninth Circuit distinguished between a "very full year" in a

14  new country with facts that point "unequivocally" to the conclusion that the

15  previous country has been abandoned. <u>Mozes</u>, 239 F.3d at 1083.

16      Here, Erika and Salvo shared an intent to abandon San Diego and adopt

17  Singapore as the family's new habitual residence. Moreover, I.A. had more than

18  one "very full year" abroad. Rather, until Erika decided to remain in San Diego,

19  I.A.'s life was firmly rooted in Singapore. At the time of her trip to San Diego in

20  July 2015 with her mother, I.A. had spent nearly as much time in Singapore as

33

she had in San Diego. I.A. attended two years of school and was enrolled in her third. She participated in gymnastics, capoeira, and swimming. She had friends both in school and out of school. She was a patient of a pediatrician and a dentist. While I.A.'s passport is certainly representative of an international traveler, her numerous trips abroad simply reflect the family and lifestyle she was being raised in.

I.A.'s current contacts with San Diego undoubtedly make this case troubling. At the time of this Order, I.A. will have spent nearly four months in San Diego. Because she has just turned six years old, she has undoubtedly adjusted back to life in the United States. The Court takes no pleasure in deciding that I.A. should be removed from her second-life here in San Diego. As mentioned repeatedly at trial, the Court hopes that Erika and Salvo can keep I.A.'s best interests in mind as she returns to her life in Singapore.

Nonetheless, the fact remains that I.A. was settled in Singapore prior to her San Diego trip. Her life was not in flux, see Papakosmas v. Papakosmas, 483 F.3d 617, 627 (9th Cir. 2007) (refusing to find acclimatization when the children at issue frequently moved between houses in the new country), nor was her time in Singapore so short that her life could not become firmly embedded there, see Holder, 392 F.3d at 1021 (noting that eight months was insufficient for a newborn to become acclimatized to a new country). She spent formidable years in

1  Singapore, where she lived a full and active life. Returning I.A. to Singapore is

2  thus tantamount to returning her home. <u>See</u> <u>id.</u> at 1019.

3

4  **B.    Wrongful Removal**

5          For the purposes of the Convention, removal of a child is wrongful if it is "in

6  breach of rights of custody attributed to a person . . . under the law of the State in

7  which the child was habitually residence immediately before the removal . . . ."

8  Treaty Doc., art. 3, § a. The parent seeking return must have been actually

9  exercising those rights at the time of removal, or would have been exercising

10 their rights but-for the removal. Treaty Doc., art. 3, § b.

11         The Convention grants the courts the authority to take judicial notice of the

12 law in the State of the child's habitual residence. Treaty Doc., art. 14. At the

13 conclusion of trial, the Court requested verification relating to Singapore's

14 Women's Charter. In supplemental briefing by Erika, the Court received the

15 sworn affidavit of Moraly Joseph Veronica, a duly licensed attorney in Singapore.

16 As such, the Court takes judicial notice of the Women's Charter attached to

17 Erika's supplemental briefing, ECF No. 49-3.

18         The Women's Charter outlines the rights and duties of husband and wife

19 upon the solemnization of marriage. Specifically, the Charter states, "the

20 husband and wife shall be mutually bound to co-operate with each other in

15cv1980

1   safeguarding the interest of the union and in caring and providing for the

2   children." Women's Charter § 46. Moreover, the Deed of Separation outlines

3   Erika and Salvo's agreement to share care and custody of I.A. on an alternating

4   weekly schedule.

5           Salvo was actively engaged in caring for I.A. up to the time of I.A.'s trip to

6   San Diego. Salvo also had plans to continue caring for I.A. following her return.

7   Because Salvo was exercising his rights to custody, and because Erika interfered

8   with Salvo's rights by removing I.A. to San Diego, the removal was wrongful.

9

10                                        **III.**

11          I.A. was habitually resident in Singapore leading up to her removal to the

12  United States on July 21, 2015, because her parents intended to abandon San

13  Diego and adopt Singapore as the family's place of habitual residence.

14  Moreover, I.A. was acclimatized to life in Singapore, where she lived a full and

15  active life. Erika's removal was wrongful because it was in breach of Salvo's

16  rights of custody, which he exercised up to the time of the removal, and planned

17  to continue to exercise thereafter.

18  //

19  //

20  //

1         For the reasons discussed above, the Court **GRANTS** Salvo's verified

2    petition for the return of his child.

3

4    **IT IS SO ORDERED.**

5

6    Dated:  January 12, 2016

7                                Barry Ted Moskowitz, Chief Judge

8                                United States District Court

9

10

11

12

13

14

15

16

17

18

19

20

37